NO. 07-06-0232-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



SEPTEMBER 15, 2006


______________________________



GUY A. WELLS, M.D., 



 Appellant


v.



MARY ASHMORE, individually and as surviving spouse of 


 LAWRENCE ASHMORE, deceased, and FRANCES MCFARLAND, 

 

 Appellees

_________________________________



FROM THE 72nd DISTRICT COURT OF LUBBOCK COUNTY;



NO. 2005-532,780; HON. RUBEN REYES, PRESIDING


_______________________________



Opinion


_______________________________



Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

 This appeal involves a health care liability claim prosecuted by Mary Ashmore,
individually and as surviving spouse of Lawrence Ashmore, deceased, and Frances
McFarland (collectively referred to as Ashmore). Guy A. Wells, M.D., (Wells) appeals from
an order denying his objections to the medical expert report of Ashmore. He contends that
the trial court abused its discretion in denying his objections because the report "fail[ed] to
set forth the element of causation in a non-conclusory manner as required by American
Transitional Care Centers v. Palacios, and its progeny." We agree and reverse the order. 
 Background

 Lawrence Ashmore was diagnosed with a heart attack in Artesia, New Mexico, and
transferred to Covenant Hospital in Lubbock, on September 5, 2003. At the time, he was
under the care of Wells. On the night of the 5th, Lawrence developed seizures and irregular
heart rhythms and died the next day. His surviving wife and daughter then sued Wells for
failing to provide adequate care to him. 

 Dispute arose below regarding the sufficiency of the expert report tendered by
Ashmore per §74.351 of the Texas Civil Practice and Remedies Code. According to Wells,
it failed to adequately explain, among other things, how the alleged deficiencies in his
performance caused Lawrence's death. Because of that perceived defect, Wells moved
to dismiss the case with prejudice. The trial court denied the motion, and the appeal
ensued. 

 Applicable Law

 One suing for medical malpractice must:

 [n]ot later than the 120th day after the date the original petition was filed,
serve on each party . . . one or more expert reports, with a curriculum vitae
of each expert listed in the report for each physician or health care provider
against whom a liability claim is asserted . . . . 

 Tex. Civ. Prac. & Rem. Code Ann. art. §74.351(a) (Vernon Supp. 2006). Should the
claimant not do so and upon motion, the trial court must enter an order 1) awarding the
movant reasonable attorney's fees and costs of court incurred and 2) "dismiss[ing] the
claim with respect to the physician or health care provider, with prejudice to the refiling of
the claim." Id. §74.351(b)(1) & (2). On the other hand, if the report is filed yet challenged,
the challenge must be sustained and the cause dismissed ". . . if it appears to the court,
after hearing, that the report does not represent an objective good faith effort to comply with
the definition of an expert report . . . ." Id. §74.351(l); see Jernigan v. Langley, 111 S.W.3d
153, 156 (Tex. 2003) (stating that the cause must be dismissed if the trial court determines
that the report does not represent a good faith effort to comply with the definition of an
expert report). Moreover, the term "expert report" has been defined by statute to mean "a
written report by an expert that provides a fair summary of the expert's opinions as of the
date of the report regarding applicable standards of care, the manner in which the care
rendered . . . failed to meet the standards, and the causal relationship between that failure
and the injury, harm or damages claimed." Id. §74.351(r)(6). 

 To constitute a "fair summary" of the expert's opinions, the document must contain
more than conclusions. Bowie Memorial Hospital v. Wright, 79 S.W.3d 48, 52 (Tex. 2002);
American Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 879 (Tex. 2001). 
Instead, the expert must provide enough data to not only inform the defendant of the
specific conduct called into question but also provide the trial court means to preliminarily
assess whether the claim has factual basis. Bowie Memorial Hospital v. Wright, 79 S.W.3d
at 52; Chisholm v. Maron, 63 S.W.3d 903, 906 (Tex. App.-Amarillo 2001, no pet.). For
instance, in Bowie, the expert "simply opine[d] that [the patient] might have had 'the
possibility of a better outcome' without explaining how Bowie's conduct caused injury . . .
." Bowie Memorial Hospital v. Wright, 79 S.W.3d at 53 (emphasis added). Given the
missing explanation, the report "lack[ed] information linking the expert's conclusion . . . to
Bowie's alleged breach . . .," according to the Supreme Court. Id. So too did the missing
information render the document conclusory, the court continued, and something short of
"a good faith effort to meet the Act's requirements." Id. at 54. Thus, it determined that
dismissal of the suit was mandated. Id. 

 So, what we learn from Palacios, Bowie, and like opinions is that to be sufficient an
export report must include more than the mere statement that a purported breach of an
applicable standard of care caused a particular outcome. Rather, information explaining
the link between the standard of care, its breach, and the ensuing injury must be contained
within its four corners. So, when addressing the topic of causation, an expert is required
to provide some factual information describing how and why the breach resulted in the
injury. And, while this explanation need not equate a marshaling of evidence, Rittmer v.
Garza, 65 S.W.3d 718, 723 (Tex. App.-Houston [1st Dist.] 2001, no pet.), it must be more
than conclusions. 

 Application of the Law

 The expert report at bar was provided by Dr. Howard I. Kurz. In it, he stated the
standards of care applicable in circumstances confronting Wells. So too did the expert
specify the manner in which Wells allegedly breached those standards. Yet, when it came
to connecting the purported defaults to the death of Lawrence, he opined:

 Mr. Ashmore would within a reasonable degree of medical certainty
survivedhad the above mentioned measures been performed upon arrival. 
However, it is still possible he would have survived had Dr. Wells responded
and taken appropriate measures when first paged by nursing staff.


 * * *



 It is my opinion that Dr. Wells breached the applicable standard of care in his
treatment of Mr. Ashmore . . . and these acts of or omissions proximately
caused Mr. Ashmore's death . . . . 


Missing from these opinions is information explaining the link between the alleged defaults
committed by Wells and Mr. Ashmore's death. Simply put, how or why they resulted in his
death went unmentioned. Similarly unmentioned by Kurz is the condition of which
Lawrence ultimately died. This is of import because elsewhere in his report the expert
uttered that 1) increased doses of levophed and dopamine were administered to Mr.
Ashmore "which lead to peripheral vasoconstriction and hypoperfusion as manifested my
[sic] mental confusion and kidney shutdown" and 2) administering "large doses of pressors
caus[ed] tissue hypoperfusion with kidney shutdown." Had the expert related that death
resulted from vasoconstriction, hypoperfusion, mental confusion, or kidney shutdown, then
it may be arguable that the report illustrated the requisite nexus between the purported
conduct of Wells and the death of his patient. But, without specifying whether Ashmore
died of heart failure, kidney failure, mental confusion, a combination of one or more of
those conditions or of something else, Kurz provided us with no factual data tying the
administration of those drugs to Lawrence's death. Simply put, without knowing what
Lawrence ultimately died of we are left to only guess at the relationship between supposed
bad acts on the part of the doctor and the death. 

 In sum, the allegations made by Kurz regarding causation were mere conclusions
because they did not explain how the purported defaults caused Lawrence's death; the
expert merely concluded that they did. See Nelson v. Ryburn, No. 07-05-0166-CV, 2006
Tex. App. Lexis 3081 at *7 (Tex. App.-Amarillo April 18, 2006, no pet.). So, the report fell
short of constituting a good faith effort to provide a fair summary between the alleged
misconduct of Wells and its relationship to Mr. Ashmore's death, and the trial court had no
discretion but to sustain Wells' objections. 

 Accordingly, we reverse the order of the trial court denying Wells' objections to the
report and remand the cause for further proceedings. (1)


 Brian Quinn 

 Chief Justice








 
1. Statute provides that if "an expert report has not been served within the period specified . . . because
elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order
to cure the deficiency." Tex. Civ. Prac. & Rem. Code Ann.§74.351(c) (Vernon Supp. 2006). Omitted from this
language is that found in its predecessor and requiring the claimant to have acted without intent or conscious
indifference before leave to amend could be granted. See Tex. Rev. Civ. Stat. Ann. 4590i, §13.01(g)
(repealed effective September 1, 2003) (stating that leave to amend could be granted if the default was not
intentional or the result of conscious indifference but rather the result of accident or mistake). Furthermore,
Ashmore solicited, here and below, leave to cure any deficiency found in the report tendered. Given the
request, we deem it appropriate to remand the cause so the trial court may decide whether to exercise the
discretion vested in it by §74.351(c). 



4). One such exception is a search conducted pursuant to voluntary
consent. Reasor v. State, 12 S.W.3d 813, 817 (Tex.Crim.App. 2000). Before consent to
search is deemed voluntary, the state must prove by clear and convincing evidence that
the consent was freely and voluntarily given. Id.; Meeks v. State, 692 S.W.2d 504, 509
(Tex.Crim.App. 1985). The burden is on the prosecution to show that consent was
positively and unequivocally given without duress or coercion. Meeks, 692 S.W.2d at 509. 
Whether consent was given voluntarily is a question of fact to be determined from the
totality of the circumstances surrounding the giving of consent. Id. at 510. The scope of
a consensual search is determined by what a reasonable person would have expected the
search to include. See Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d
297 (1991). In a suppression hearing, the trial court is the sole and exclusive trier of fact
and judge of the credibility of the witnesses and the weight to be given their testimony. 
Romero v. State, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990).

 In the present case, the record reflects that the investigators did threaten to arrest
Amanda on the day that they retrieved the letters. However, the record further reflects that
the investigators had authority to arrest Amanda for harboring a fugitive when appellant
was found in her home after she had reported that he was not there. When Amanda
expressed concern that she had no one to care for her child should she be arrested, the
investigators informed her that Children's Protective Services could be called to take
temporary custody of the child. The investigators made these threats independently of any
investigation of appellant and the threats were not made in an attempt to elicit incriminating
evidence to be used against appellant. Further, any coercive effect of the threats was
attenuated when the investigators, as they were leaving Amanda's home, informed her that
she was not going to jail. 

 After the investigators left with appellant, Amanda's mother advised her that she
needed to cooperate with the investigation of appellant. At her mother's urging, Amanda
contacted the investigators and informed them that she had "some letters that they could
look at . . . ." Only two investigators went to Amanda's residence to retrieve the letters. 
When the investigators entered Amanda's residence, she had a group of letters separated
into a bundle. Amanda testified that she told the investigators that she would go through
the letters and call them if she found "something." She testified that she did not intend for
the investigators to take all of the letters, but she did not identify which letters she intended
to turn over or which letters she had intended to keep. Greg Tyra, one of the investigators,
testified that Amanda simply handed a bundle of letters to the investigators and that this
bundle included the letter that the State sought to admit in this case.

 Viewing the totality of the circumstances surrounding Amanda's consent, we
conclude that Amanda positively and unequivocally consented to the investigators' intrusion
into her residence to retrieve the letters and that this consent was not the result of coercion. 

 As the testimony regarding the scope of the consensual search was in direct conflict,
we must defer to the trial court's factual determination regarding how the letter sought to
be admitted was obtained. Romero, 800 S.W.2d at 543. Further, we conclude that a
reasonable person would have expected that the scope of the consensual search would
have included the entire bundle of letters based on the totality of the circumstances
surrounding Amanda's consent. See Jimeno, 500 U.S. at 251.

 Concluding that Amanda voluntarily gave the investigators consent to search and
that the investigators did not exceed the scope of that consent, we overrule appellant's
second issue.

Issue 3: Relevance

 Finally, appellant contends that the trial court erred in admitting the letter because
the letter was not relevant because it was dated approximately eight months prior to the
assault for which appellant was being tried. The State contends that it provided sufficient
evidence to create a fact question as whether the letter was written after and in reference
to the alleged assault, and the determination of the letter's relevance was not an abuse of
discretion.

 Relevant evidence is evidence which has any tendency to make the existence of any
fact of consequence to the determination of the action more probable or less probable than
it would be without the evidence. Rule 401. The determination of the relevance of
evidence lies largely within the sound discretion of the trial court and will not be disturbed
on appeal absent a clear abuse of that discretion.  Moreno v. State, 858 S.W.2d 453, 463
(Tex.Crim.App. 1993).

 In the present case, it is undisputed that the letter in question bears the date of
January 16, 2004. However, Amanda testified that she received the letter in 2005 and that
the letter was misdated. Amanda further testified that she keeps letters in the envelopes
she receives them in and that the envelope which contained this letter was postmarked
January 2005. However, Amanda also testified that she could not be certain that she
received that letter in that envelope. Chief Deputy Larry Lee testified that appellant was
incarcerated in the Wilbarger County Jail from September 13, 2004 until February 4, 2005,
that the return address on the envelope that contained the letter was the address of the
Wilbarger County Jail, and that the records do not indicate that appellant had ever been
incarcerated in the Wilbarger County Jail prior to September of 2004. Thus, a fact question
existed as to whether the letter was written before or after the alleged assault.

 It was for the fact finder to resolve inconsistencies in testimony and to resolve the
issue of whether the letter was written at a time when it could be referencing the assault
on Winston Jones. See Santellan v. State, 939 S.W.2d 155, 164 (Tex.Crim.App. 1997). 
Considering the conflict in the testimony concerning when this letter was written, we cannot
say that the trial court's determination that the letter was relevant to appellant's trial for
assault constituted a clear abuse of discretion. Consequently, we overrule appellant's third
issue.

Conclusion

 Having overruled each of appellant's issues, we affirm the judgment of the trial court.


 Mackey K. Hancock

 Justice





Publish. 
1. Further reference to Texas Rules of Evidence will be by reference to "Rule __."